UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
UNITED STATES OF AMERICA                                   :
                                                           :
            v.                                             :    10 CR 399 (LTS)
                                                           :
THOMAS HARDIN,                                             :
                                                           :
                    Defendant.                             :
                                                           :
-----------------------------------------------------------X

**SENTENCING MEMORANDUM SUBMITTED ON BEHALF OF THOMAS HARDIN**

Larry H. Krantz, Esq.
Kimberly A. Yuhas, Esq.
**Krantz & Berman LLP**
747 Third Avenue, 32nd Floor
New York, NY 10017-2803
(212) 661-0009

*Attorneys for Thomas Hardin*

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ……………………..………………..…… 1

II.  A NON-CUSTODIAL SENTENCE IS APPROPRIATE FOR MR. HARDIN ..…. 2

   A. The Advisory Sentencing Guidelines ………..………………....………. 2

   B. The History and Characteristics of the Defendant and Nature
      of this Offense ……………………..……………………….....…… 3

        1. Mr. Hardin's Childhood and Education ……………………..…………… 4

        2. Family Life ……………………………………………..…………. 6

        3. Church and Community Service ……………………………..…………… 8

        4. The Offense Conduct ……………………………….…………… 11

        5. Mr. Hardin's Cooperation with the Government ……………...………… 11

   C. A Non-Custodial Sentence Reflects the Seriousness of the Offense, Provides
      Just Punishment, Promotes Respect for the Law, Affords Adequate Deterrence
      and Protects the Public in Satisfaction of § 3553(a)(2) ……………………….. 14

        1. Mr. Hardin has Substantially Suffered, and Shown Remorse,
           for his Crimes ……………………………………………..…….. 14

        2. A Non-Custodial Sentence Satisfies the Goals of Deterrence ……….….. 16

   D. A Non-Custodial Sentence for Mr. Hardin will Avoid Unwanted
      Sentencing Disparities ……………… ……………………………….. 16

III. CONCLUSION ……………………………..……………………...……….. 18

## I. PRELIMINARY STATEMENT

We submit this memorandum in connection with the upcoming sentencing of Thomas Hardin, who has pleaded guilty to the offense of insider trading. While this is a serious offense, Mr. Hardin has spent the last six years trying to make amends for his misconduct principally through his extensive cooperation with the Government. Indeed, what is remarkable about this case is that on the very day that Mr. Hardin was first approached by the Federal Bureau of Investigation ("FBI") in July 2008, he *immediately* disclosed his offense conduct and agreed to become a cooperating witness. He did so without even seeking the advice of counsel, and in fact cooperated for the next year without any formal cooperation agreement, and indeed without any representation. During that time, he was fully debriefed, made dozens of consensual recordings, and helped the Government in a myriad of other ways. In all, as confirmed in the Government's 5K1.1 letter, his cooperation assisted in the conviction of dozens of insider trading defendants, including the discovery of an expert insider trading ring that led to 20 convictions alone. *See* Government's Sentencing Memorandum, dated Jan. 21, 2015 ("Govt. 5K1.1 Letter"), at 8.

We believe that this level of cooperation, coupled with the other factors set forth below, merit a sentence of time served. Indeed, we note that virtually every other cooperating witness in this and other related insider trading investigations has been given a non-incarcerative sentence, as we summarize below. In fact, many of these individuals were themselves prosecuted based on information provided by Mr. Hardin.

In the following submission, we detail the otherwise exemplary life of Mr. Hardin – his devotion to his family, friends, and community; his strong work ethic and charitable works; his fall in the securities industry and personal hardships due to the offenses of conviction; and his ability and willingness to accept responsibility for his mistakes. We hope that this submission, the accompanying letters in support of Mr. Hardin, the Government's letter motion pursuant to

1

U.S.S.G. § 5K1.1, and the Probation Department's Presentence Report ("PSR") paint a full picture of Mr. Hardin—one that portrays him as a genuinely kind and otherwise honorable man who has accepted, and repented for, his criminal mistakes.

We respectfully submit that, in light of Mr. Hardin's extraordinary cooperation with the Government, as well as the other relevant factors under 18 U.S.C. § 3553, a sentence of time served is sufficient to satisfy the policy considerations of sentencing.  Indeed, the Probation Department recommends a sentence of time served in its PSR.  The Government, highlighting Mr. Hardin's "substantial assistance," has similarly moved for a below-Guidelines sentence in its letter motion pursuant to U.S.S.G. § 5K1.1 and – further – takes no position as to our request for a sentence of time served.  Moreover, for these same reasons, we respectfully request that the Court impose no fine on Mr. Hardin, as he has already suffered great financial harm.  Thus, a fine would be "greater than necessary" punishment and therefore unwarranted in achieving the sentencing goals under 18 U.S.C. § 3553.  Indeed, Mr. Hardin has consented to a criminal forfeiture in the amount of $46,743.

## II.     A NON-CUSTODIAL SENTENCE IS APPROPRIATE FOR MR. HARDIN

### A. The Advisory Sentencing Guidelines

As is well-known, in *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that mandatory application of the Sentencing Guidelines was unconstitutional.  *See, e.g., Kimbrough v. United States*, 522 U.S. 85, 100-01 (2007).  Accordingly, the Supreme Court rendered the Guidelines advisory only, and replaced their rigid application with a more flexible framework, which now requires the Court to consider each of the factors under 18 U.S.C. § 3553(a) in fashioning an appropriate, individualized sentence.  *See Booker*, 543 U.S. at 259-60.

Today, a Court must treat the Guidelines calculation only as a "starting point," and instead "must then consider all the § 3553(a) factors and [] undertake an individualized assessment based on the facts presented." *United States v. Johnson*, 567 F.3d 40, 50 (2d Cir. 2009).  Using this

framework, it is the Court's duty to determine a sentence that is "sufficient, but not greater than necessary" to accomplish the federal sentencing goals. *Booker*, 522 U.S. at 101.

We respectfully submit that the Guidelines calculation is of less importance in imposing sentence on Mr. Hardin in light of the Government's detailed 5K1.1 letter. While we fundamentally agree with the basic arithmetic of the Probation Department's Guidelines calculation as set forth in the PSR, we nonetheless submit that strict adherence to it here would result in punishment greater than necessary for Mr. Hardin. Rather, Mr. Hardin's individual circumstances and extraordinary cooperation, considered within the framework of § 3553(a), justify a non-Guidelines sentence of time served.

### B. The History and Characteristics of the Defendant and Nature of this Offense

Pursuant to 18 U.S.C. § 3553(a)(1), the Court must take into account "the nature and circumstances of the offense and the history and characteristics of the defendant" in reaching an appropriate sentence for Mr. Hardin. As discussed below, this instant insider trading offense represents a marked deviation from Mr. Hardin's otherwise law-abiding life. Moreover, the nature and circumstances of this offense, while aberrational, must also be viewed alongside the years of Mr. Hardin's exemplary cooperation with the Government.

Indeed, as the Government recognizes, even at his very first meeting with federal authorities, "Hardin readily admitted wrongdoing, accepted responsibility for his criminal conduct, and expressed a desire to cooperate." *See* Govt. 5K1.1 Letter at 4. Moreover, Mr. Hardin never wavered from his initial acceptance and subsequent journey towards rehabilitation, but instead consistently provided "quality" information that "contributed in significant part to dozens of insider trading convictions in the Southern District of New York in the past five years." *See* Govt. 5K1.1 Letter at 8. Accordingly, after a review of Mr. Hardin's past, and his admirable efforts to

rehabilitate himself to the present, we respectfully submit that a non-custodial sentence plainly satisfies § 3553(a)(1).

1. Mr. Hardin's Childhood and Education

Thomas Hardin, now 37 years old, was born in Orlando, Florida in 1977 to loving parents, Craig and Beverly Hardin. He is the oldest of three boys. Mr. Hardin's younger brothers – James and Alvin – are two and six years younger, respectively. Shortly after Mr. Hardin was born, his family moved to Lilburn, Georgia – a suburb of Atlanta – where Mr. Hardin's parents settled to raise their family. Mr. Hardin grew up in a loving household. As one friend explains it, Mr. Hardin's "father and mother are truly 'salt of the earth' . . . . [and he had] very much a 'main street America' upbringing." *Alicia L. Syrett Letter*.

Mr. Hardin's father, Craig, worked for the Coca-Cola Company in Atlanta, while his mother, Beverly, ran a childcare service for several years in the family's home. Growing up, Mr. Hardin took his role as older brother seriously, and sought to serve as a strong, positive role model for his two younger siblings. Indeed, the three brothers were very tightly-knit as children. As adults, the three men are best friends. His brother, Jim, considers Mr. Hardin to be his "trailblazer" and recalls how he "always had the luxury of Tom showing [him] the way," *see James Craig Hardin, Jr. Letter*, while Mr. Hardin's youngest brother, Alvin, describes how "Thomas is six years older than me but was still my world when I was young . . . . I would not be where I am today if it wasn't for my brother." *Alvin W. Hardin Letter*.

In school, Mr. Hardin excelled academically and was a very well-rounded student. Socially, he was well-liked among his classmates, and had friends in a variety of social circles. Indeed, the numerous support letters submitted on his behalf consistently speak of Mr. Hardin as an inherently good person who is very easy to get along with. As his wife, Susan, poignantly describes:

> Very early on after I met Tom, I knew he was someone I wanted to be
> with every day. Very soon after that, I knew he was the man with

4

> whom I wanted to spend the rest of my life. He had the typical characteristics that many women look for in a partner: kind, funny, intelligent and comforting. But the one quality about Tom that struck me more than anything is how good-natured he is and what a truly good person he is. I think this is a rare thing to find in anyone, and I had hit the jackpot by dating someone who inhabited this trait through and through. Early in our relationship, he showed me examples of this: late at night after going out to bars with friends, he walked past a homeless man on the NYC streets. Most people would continue and not even pay attention, but Tom stopped, asked the man if he would like a warm meal, and brought him to a nearby McDonald's. But instead of just buying the man food and leaving, Tom sat with him and shared a meal. This demonstrated to me that Tom is a kind and thoughtful person who goes out of his way to help others.

*Susan Hardin Letter.*

In school, Mr. Hardin received straight A's throughout elementary and high school, took a number of advanced placement ("AP") classes in preparation for college, and graduated among the top ten students in his class. He was also extremely active with soccer, a sport that he not only played for twelve years but also worked in as a referee. His father fondly describes Mr. Hardin as a young soccer referee, a job he acquired at the age of twelve:

> After completing the mandatory training course for referees, he then became completely committed during his teenage years on Saturdays and Sundays to perform alternately as the center referee or as one of the linesman. What a treat for his father to stand anonymously in the crowd and watch his son totally immersed as the referee during a youth soccer game in front of large crowds of parents, family, and friends!

*James C. Hardin Sr. Letter.*

Mr. Hardin's hard work and extracurricular involvement in high school paid off, as he was accepted into the University of Pennsylvania's elite Wharton School in 1995 and received a competitive scholarship from the Air Force Reserve Officers' Training Corps ("ROTC"), which financed approximately 80% of his tuition. Mr. Hardin continued to exude his easygoing, affable personality, which made him popular among his peers in college, as well. As Mr. Hardin's

college friends describe:

> We all met as freshman at the University of Pennsylvania. Although we all came to college from different parts of the country and with different academic interests, we immediately bonded and gravitated towards Tom's affability, intelligence, and humility.

*Ken Massey and Anna Hilton Letter*.

Furthermore – true to form – Mr. Hardin also excelled academically at Penn. He majored in economics with a concentration in finance and graduated with an overall GPA of 3.4, which made him a prime candidate for some of the most elite jobs on Wall Street, which was a job he dreamed of since childhood.

    2.  <u>Family Life</u>

At his core, Thomas Hardin is a true family man. He met his wife, Susan Machorek, in August 2002 through mutual friends, when he was just 25 years old. They fell in love quickly and the young couple got engaged approximately a year later, in August 2003. Mr. Hardin and Susan enjoyed a two-year engagement, and then wed in a Catholic ceremony before family and friends in May 2005. After buying their first home in Westwood, New Jersey, in September of 2008, Mr. Hardin and Susan's first daughter, M███, was born in October 2009. The couple's second daughter, C███ was born in December 2011. Indeed, the Hardin family lives as what one would describe as a typically modest and loving middle-class lifestyle.

Since early 2009, due to his legal troubles, Mr. Hardin has become a stay-at-home father. Although this particular "career" path was admittedly unexpected, as many of the letters in support of Mr. Hardin attest, he is wonderfully devoted to his two young daughters and has dedicated himself completely to this role. His wife candidly describes Mr. Hardin's function at home:

> Because of the professional line that he crossed and mistakes that he made in violating securities laws, Tom was somewhat forced into the role of a stay-at-home dad. Although he never envisioned being the primary caregiver to our children, Tom has shown himself to be a patient and positive presence in the lives of our two daughters, M███

6

> and C███ He takes M██ to school and her various activities including dance class and speech therapy, and takes C███ to her play groups and music class. He disciplines them, cooks their meals and makes them laugh uncontrollably. Tom is usually the only father in the group of moms and grandparents but he has assimilated into the suburban parent culture extremely well. When our girls get older and can understand the situation, we will tell them about what mistakes Tom made in his professional life; however, I cannot think of a better role model to have raising our children.

*Susan Hardin Letter*. Indeed, Mr. Hardin is well-known for cooking "amazing meals for his family every night and has become famous for his creative and delicious dishes at every family and social gathering." *Major Joseph M. Haury Letter*. Others describe how Mr. Hardin "has documented M███s and then C███ birth and her parents' pride in their antics in a tender and funny blog" that Tom shares with friends and family. *Patricia Fox Letter*.

Although Mr. Hardin and his family have faced many hurdles – including financial troubles as well as emotional struggles – due to Mr. Hardin's offense conduct, he has admiringly used this time to reflect, make a concerted effort to repent, and find a deeper meaning for his life's purpose. As his brother has eloquently phrased it, Mr. Hardin has used the time during these last six years to "turn [] his attention to being a whole person—body and soul." *James Craig Hardin Jr. Letter*.

In particular, Mr. Hardin has embraced a new-found commitment to running and meditation, as to which he has established a disciplined routine that he practices six days a week. Amazingly, his routine consists of waking up at 4:30 a.m., meditating for twenty minutes, and then going on a ten-mile run – all of which he accomplishes before his two young daughters even wake up. In the evenings, he runs for another five miles after putting his children to bed. When all is said and done, Mr. Hardin meditates for two hours and runs 80 miles weekly – this, in addition to other milestones, including his completion of seven half-marathons and seven full marathons; a commitment to run his age in miles every year on his birthday; and a plan to run his first ultra-marathon in May 2015.

7

Candidly, this physical regimen has helped Mr. Hardin effectively deal with the depression and other emotional anguish arising from the consequences of his criminal conduct.

Even Mr. Hardin's family and friends have observed a noticeable change in his physical and emotional well-being. For example, his wife explains that, after Mr. Hardin's legal troubles, he "began to exercise and eat healthy, something that he had never previously done, and in the process he has shed over 50 pounds and is now a devoted runner . . . . Tom had inspired me to make running and healthy eating more of a priority in my life as well." *Susan Hardin Letter*. His mother-in-law also notes how "[h]is running regime has helped to focus him even as it strengthens his mind and body." *Christine Machorek Letter*. Indeed, as exemplified in the many letters submitted by family and friends, it is apparent that Mr. Hardin has taken an extremely troubling time of his life and transformed it into an opportunity for personal growth, commitment to family, as well as positive physical and emotional change.

   3. <u>Church and Community Service</u>

Mr. Hardin grew up Episcopalian, but he truly discovered religion after being introduced to his now-wife, Susan. Although Mr. Hardin's church attendance originally began somewhat out of obligation to Susan when they first started dating, his relationship with the Catholic Church quickly developed into one of deeply personal faith and devotion. Mr. Hardin converted to Catholicism so that he and Susan could get married in a religious ceremony, and the couple continues to attend mass weekly– now, with their daughters, with whom they are dedicated to instilling the same faith.

Presently, Mr. Hardin and his family are members of St. Andrew's Catholic Church in Westwood, New Jersey. Mr. Hardin's devotion to the church, however, extends far beyond just regular mass attendance. Since Mr. Hardin has been out of work these last six years, when not with his family or training for a marathon, he is most likely helping his parish. For example, he is extremely involved in the church's Human Concerns Committee, which endeavors in volunteer

efforts to clothe and feed the homeless. His friends write of how Mr. Hardin "sorts, folds, boxes and stores more than 200 tons of clothing and household items that are then sent on to the needy both locally and in Appalachia and Haiti" and how "Tom [even] ran a pancake breakfast to raise the funds necessary to cover the associated expenses." *Kathie and John Chambers Letter*. It may be the Committee's project coordinator, however, who sums up Mr. Hardin's church contributions best:

> As you can imagine, this mission, this work, this volunteerism, can only happen with dedicated people—enter Tom Hardin. This unique individual has taken upon himself a mission to help others have better lives for their families. I can only try to explain in this letter the hundreds of hours he has spent away from his wife and children to give back to people whom he will never know or meet in his lifetime. That is true humanitarianism.

*Greg Ryan Letter*. Indeed, Mr. Hardin was named "Volunteer of the Month" in his local New Jersey newspaper for his dedication to this cause. *See* Ex. A ("Westwood's Tom Hardin Steps Into Spotlight to Benefit Cause," NorthJersey.com, July 11, 2013).

Mr. Hardin is also extremely committed to the church's "Cornerstone Program" – a Catholic men's group – which serves as a Bible study and service organization that meets monthly. Mr. Hardin is second in command of the group and helps organize and run its monthly meetings, service projects, as well as Cornerstone's comprehensive retreat, which is held every eighteen months. An extraordinary moment occurred at the Cornerstone retreat in 2011, when Mr. Hardin decided to open up to his church brotherhood about his criminal offense. A fellow Cornerstone member recounts:

> Tom was one of six men who volunteered to give a witness talk to all of those present. He began his talk by telling us about his life as a young boy and his nurturing parents. He mentioned his schooling and his determination to make a meaningful contribution to his country . . . . As he continued to hold our interest, he suddenly and with noticeable sadness, revealed to us his regrettable involvement in a criminal matter to which he had pled guilty. We sat motionless as he so courageously, but tearfully, told us what he had done, though quite

9

> obviously proud to reveal that he unhesitatingly expressed a willingness to cooperate with federal authorities . . . . It was most evident to all of us that Tom was deeply wounded by his unthinkable actions and the pain that it has caused him and his family. It was truly comforting to Tom to hear, as he concluded his talk, a thunderous standing ovation by men, who openly and unashamedly cried. Tom had spoken from his heart and his sorrow was reflected in his voice and demeanor. We as men felt his pain and we assured him by our love and actions that we were his Cornerstone upon which he could rebuild his life.

*Albert F. Chestone Letter*. Another Cornerstone member describes Mr. Hardin "as a role model for all of us, who are interested in making the world a better place." *George L. Caceres, Esq. Letter*.

Mr. Hardin's charitable works extend beyond the church. For example, one of the most prominent figures and role models in Mr. Hardin's life is his grandfather, who is still alive and well today at 97 years old. His grandfather was a prisoner of war during World War II, and is a survivor of a particularly gruesome part of the war, known as The Bataan Death March. Every year, Mr. Hardin and his grandfather attend a commemorative marathon in New Mexico to honor the Bataan Death March soldiers. For several years, they walked a portion of the march together in solidarity. In 2013, Mr. Hardin decided to run his very first marathon at the Bataan Commemorative Death March in honor of his grandfather, who – astonishingly – walked eight miles of the march that year himself, at 96 years old.

Mr. Hardin has also been devoted to honoring the legacy of his father-in-law, who passed away in 2010 after a difficult battle with leukemia. Since the passing, Mr. Hardin has been deeply committed to cancer research, and has raised thousands of dollars for the Leukemia and Lymphoma Society. Indeed, Mr. Hardin has been a source of strength for his family during their grief. His wife writes how it "means the world to me that he is so invested in this organization as a way to remember and honor my father." *Susan Hardin Letter*. Moreover, his mother-in-law further

describes her own gratitude to Mr. Hardin:

> I am blessed that Tom is my son-in-law. In fact, his connection to me is very strong, especially after losing my husband to leukemia in 2010 because Tom has been an integral part of my healing process. I am in awe of his fortitude and resilience, and will never forget all the support he has given me and my family.

*Christine Machorek Letter.*

In sum, the majority of Thomas Hardin's life has been one led with kindness, generosity, and love. As virtually every letter submitted by friends and family members describe, Mr. Hardin has a warm heart and is sincerely good-intentioned. Although he participated in one aberrational event involving securities fraud, this event was truly an outlier in Mr. Hardin's otherwise exemplary, yet humble, life. What is truly remarkable about Mr. Hardin is not only his acceptance of responsibility for his past wrongdoings, but his motivation to learn from his mistakes and turn them into opportunities for positive growth and change.

4. The Offense Conduct

Because the Government's thoughtful 5K1.1 letter thoroughly addresses the offense conduct at issue, we refrain from detailing it fully in this submission. In short, Mr. Hardin engaged in insider trading on behalf of his employer, Lanexa Global Management ("Lanexa") – conduct as to which Mr. Hardin fully acknowledges his participation and wholeheartedly accepts responsibility. As a result of this insider trading, Lanexa made a profit and/or avoided losses totaling approximately $1.7 million, and Mr. Hardin's personal share of profit and/or avoided losses (through his compensation from Lanexa) amounted to approximately $52,000.

5. Mr. Hardin's Cooperation with the Government

While we acknowledge that Mr. Hardin's offense was a serious one, we also believe that the nature and circumstances of this offense must be balanced against the remarkable scope of Mr. Hardin's cooperation, which the Government describes throughout its 5K1.1 letter as "exceptional,"

11

"significant[]" and "proactive[]." *See* Govt. 5K1.1 Letter *passim*. Thus, we highlight below some of the extraordinary circumstances regarding Mr. Hardin's cooperation for this Court's consideration in imposing sentence.

On the morning of July 9, 2008, Mr. Hardin was approached by two FBI agents who requested that he speak with them. *See* Govt. 5K1.1 Letter at 4. Without hesitation, Mr. Hardin sat with the two agents that morning, and immediately "expressed a desire to cooperate." *See id*. This began more than a year of cooperation by Mr. Hardin before ever contacting an attorney. Indeed, Mr. Hardin did not seek legal representation until it was time for him to sign a cooperation agreement and plead guilty, in or around December 2009. During the course of his cooperation, Mr. Hardin met with the Government dozens of times, providing truthful and accurate information on a number of co-conspirators.

Mr. Hardin's cooperation can generally be described as one that involved "dozens of consensually recorded calls and meetings at the direction of the FBI, with more than five subjects of the Government's investigation, many of whom Hardin had initially identified for the Government." *See* Govt. 5K1.1 Letter at 5. More specifically, a crucial example of Mr. Hardin's cooperation involved his relationship with Roomy Khan, a co-conspirator from whom he received the first tip that made him a member of this expansive insider trading ring. As the Government highlights in its 5K1.1 letter: "Hardin's truthful proffers alerted the Government to Khan's deception [in lying to federal authorities] and enabled the Government to confront Khan and develop additional evidence of her wrongdoing." *See id.* at 7. Indeed, Mr. Hardin's cooperation in this regard was significant, as it alerted the Government to Ms. Khan's attempts to obstruct the criminal and civil investigations. *See id.*

Significantly, Mr. Hardin – at his own great peril – also wore a concealed recording device with colleagues and even friends in order to gather information, sometimes flying across the country

12

to do so.  For example, ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████   Notably, even though Mr. Hardin was aware that he placed himself in great danger that day, he continued to cooperate with the Government – including continuing to wear a concealed recording device – for months afterwards.

After ██████████████████████████, Mr. Hardin next agreed to cooperate and gather information on co-conspirator Wesley Wang.  In doing so, Mr. Hardin flew to California and visited Mr. Wang on three different occasions during the fall of 2008.  During these trips, Mr. Hardin met with Mr. Wang sometimes at his home, or at various conferences in the San Francisco Bay area. Mr. Hardin worked diligently to gather information, and was adept at eliciting valuable information in his conversations with Mr. Wang.  The Government, in turn, informed Mr. Hardin that he did an incredible job in cooperating against Mr. Wang.  Notably, Mr. Hardin's cooperation in this regard directly led to charges against four co-conspirators, and indirectly led to approximately 20

additional convictions, including the prosecution of an insider trading ring associated with the California expert-networking firm Primary Global Research.

These are just a few examples of Mr. Hardin's contributions during his comprehensive and lengthy cooperation with the Government, which cooperation contributed to the prosecution and conviction of dozens of defendants. The Government itself describes Mr. Hardin's cooperation as "exceptional," and acknowledges that "perhaps without Hardin's cooperation (which led to the development of other cooperating witnesses), the Government may have never uncovered the expert insider trading ring network that led to 20 convictions alone." *See* Govt. 5K1.1 Letter at 8. Indeed, due to Mr. Hardin's extraordinary cooperation and his otherwise exemplary history, we respectfully submit that a sentence of time served in this case would be appropriate in satisfying the factors set forth in § 3553(a)(1).

### C. A Non-Custodial Sentence Reflects the Seriousness of the Offense, Provides Just Punishment, Promotes Respect for the Law, Affords Adequate Deterrence, and Protects the Public in Satisfaction of § 3553(a)(2)

The second statutory factor under § 3553(a) requires the Court to consider the need for the sentence imposed, including, *inter alia*, the need to reflect the seriousness of the offense, promote respect for the law and provide just punishment, as well as the need to provide adequate deterrence and to protect the public from future crimes. *See* 18 U.S.C. § 3553(a)(2). We respectfully submit that a sentence of time served satisfies this second statutory consideration, as well.

1. <u>Mr. Hardin Has Substantially Suffered, and Shown Remorse, for his Crimes</u>

Until his criminal charges, Mr. Hardin has led a respectful, law-abiding life. However, this insider trading conviction has cast a powerful and enduring shadow not only on Mr. Hardin personally, but on his family, as well. After losing his job in February 2009, Mr. Hardin was forced to assume the role of a stay-at-home father for his two young daughters. And, although Mr. Hardin has certainly found his role as primary caregiver to be a rewarding one, the abrupt end to his Wall

14

Street career has placed significant financial strain on the household, as Mr. Hardin was the main source of income for his family. These last six years have been difficult for Mr. Hardin and his wife to find the means not only to provide for their family, but to satisfy their mounting legal costs. Indeed, his legal fees have been substantially discounted in recognition of his financial hardship.

Furthermore, Mr. Hardin will forever face the financial consequences in this regard as he will undoubtedly never be able to work in the securities industry again – indeed, pursuant to his settlement agreement with the Securities Exchange Commission ("SEC"), Mr. Hardin has agreed to a permanent injunction as well as a lifetime bar from the securities industry. Given that he is a graduate of Wharton, this is a serious constraint on his ability to find gainful employment. Moreover, Mr. Hardin has already agreed to significant financial penalties with the Government. As a result of his criminal conduct, Mr. Hardin has agreed to a criminal forfeiture in the amount of approximately $46,700 and additional disgorgement with the SEC for approximately $17,000.

Not only has he suffered financially, but the emotional and reputational consequences have been devastating to Mr. Hardin, as well. Mr. Hardin has suffered significant emotional distress at the loss of his Wall Street career, which he worked so hard to achieve. He has also undergone significant strain with his family and friends, as he has been forced to explain and apologize for his actions in order to regain the trust of his loved ones. Furthermore, Mr. Hardin has not only faced dishonor among those that he knows and loves, but his name has been publicly tarnished since it is linked to an infamous insider trading ring that has received significant media attention.

Surely, Mr. Hardin will forever have to live with the consequences of this case, including the loss of his good name, his dream career, and the accompanying residual effects on himself, as well as his family. Remarkably, however, through all of this, Mr. Hardin has gained not only a deeper and renewed respect for the law, but for life as well. Thus, in light of the suffering he has

already endured, his heartfelt remorse, and his efforts to make amends, it is clear that a sentence of time served meets the goals set forth in § 3553(a)(2)(A).

### 2. A Non-Custodial Sentence Satisfies the Goals of Deterrence

A sentence of time served also satisfies the factors in § 3553(a)(2)(B) and (C): adequate deterrence and protection of the public from future crimes. We respectfully submit that imposing a non-custodial sentence on Mr. Hardin will achieve the goals of both specific and general deterrence. Regarding specific deterrence, the record is clear that, outside of his aberrational insider trading conduct, Mr. Hardin has led an exemplary life. There is nothing in Mr. Hardin's history to suggest that he has a propensity for further criminal conduct. To the contrary, Mr. Hardin has worked diligently these last six years to better himself – both physically and mentally. Indeed, many of the support letters attest to this fact. We respectfully submit that those consequences already realized by Mr. Hardin have provided deterrence enough, and thus he poses absolutely no future threat to the public.

Moreover, a non-custodial sentence here provides adequate general deterrence to similar conduct by others. Indeed, Mr. Hardin's felony conviction and ensuing destruction of his career sends a clear message to the financial community, as the Government itself acknowledges: "Hardin's cooperation [has] received widespread public attention, sending a strong message to the financial community and public at large that insider trading will both be detected and prosecuted successfully" and thus "the convictions resulting from Hardin's cooperation serve as strong deterrence for others who would otherwise be tempted to engage in similar conduct." *See* Govt. 5K1.1 Letter at 8.

### D. A Non-Custodial Sentence for Mr. Hardin Will Avoid Unwanted Sentencing Disparities

Additionally, imposing a sentence of time served on Mr. Hardin will not result in sentencing disparities, thus further satisfying the federal sentencing goals. *See* 18 U.S.C. § 3553(a)(6). To the

contrary, a non-custodial sentence is consistent with the sentences imposed on other similarly-situated defendants in insider trading cases, including those cases related to Mr. Hardin's. We believe it is appropriate to compare the sentences of these defendants in order to reach a similarly proportionate sentence for Mr. Hardin – one which results in time served.

In this regard, using best efforts, we have identified 12 similarly-situated defendants in other insider trading cases who were facing significant prison time under the Sentencing Guidelines, but were nonetheless sentenced to probation in this district, based in large part on their cooperation:

| Case | Judge | Guidelines | Sentence Imposed |
|---|---|---|---|
| *United States v. Devlin*, 08-cr-01307 | Hon. William H. Pauley | 37-46 mos. Prison | 36 mos. Probation |
| *United States v. DeVore*, 11-cr-00032 | Hon. Jed S. Rakoff | 18-24 mos. Prison | 24 mos. Probation |
| *United States v. Far*, 09-cr-01009 | Hon. Robert P. Patterson | 46-57 mos. Prison | 24 mos. Probation |
| *United States v. Kumar*, 10-cr-00013 | Hon. Denny Chin | 87-108 mos. Prison | 24 mos. Probation |
| *United States v. Longoria*, 11-cr-00032 | Hon. Jed S. Rakoff | 46-57 mos. Prison | 24 mos. Probation |
| *United States v. Motey*, 10-cr-01249 | Hon. Jed S. Rakoff | 18-24 mos. Prison | 12 mos. Probation |
| *United States v. Nguyen*, 11-cr-00032 | Hon. Jed S. Rakoff | 18-24 mos. Prison | 24 mos. Probation |
| *United States v. Scolaro*, 11-cr-00429 | Hon. William H. Pauley | 30-37 mos. Prison | 36 mos. Probation |
| *United States v. Shimoon*, 11-cr-00032 | Hon. Jed S. Rakoff | 37-46 mos. Prison | 24 mos. Probation |
| *United States v. Slaine*, 09-cr-01222 | Hon. Richard J. Sullivan | 46-57 mos. Prison | 36 mos. Probation |
| *United States v. Smith*, 11-cr-00079 | Hon. Jed S. Rakoff | 57-71 mos. Prison | 24 mos. Probation |
| *United States v. Wang*, 12-cr-00541 | Hon. Jed S. Rakoff | 30-37 mos. Prison | 24 mos. Probation |

These defendants, like Mr. Hardin, offered substantial assistance to the Government and were accordingly recognized for their cooperation efforts. Indeed, in virtually every instance, the Judge presiding over each case recognized the defendant's cooperation as a significant factor in imposing a probationary sentence. In this regard, we attach for the Court as Exhibit B, copies of news sources reporting on each of the defendant's sentencing proceedings.

17

Accordingly, we respectfully submit that – in light of the sentences afforded to similarly-situated defendants in other insider trading cases in this district – it is clear that a sentence of time served for Mr. Hardin is not only appropriate, but necessary, in order to avoid unwanted sentencing disparities. Indeed, some of the very individuals against whom Mr. Hardin's cooperation led to successful prosecutions – specifically Daniel DeVore, Anthony Longoria, Karl Motey, Bob Nguyen, Walter Shimoon, and Wesley Wang – received a non-custodial sentence in light of their own cooperation. It would be unwarranted indeed for Mr. Hardin to receive a harsher sentence than those against whom he cooperated, and who pleaded guilty as a result of his cooperation.

### III.  CONCLUSION

For the foregoing reasons, as well as those set forth in the Government's 5K1.1 letter, we respectfully request that the Court impose a sentence of time served for Mr. Hardin and no fine.

Dated: February 11, 2015
　　　　New York, New York

　　　　　　　　　　　　　　　　　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　Larry H. Krantz, Esq.
　　　　　　　　　　　　　　　　　　　　　　Kimberly A. Yuhas, Esq.
　　　　　　　　　　　　　　　　　　　　　　**Krantz & Berman LLP**
　　　　　　　　　　　　　　　　　　　　　　747 Third Ave., 32nd Floor
　　　　　　　　　　　　　　　　　　　　　　New York, New York 10017
　　　　　　　　　　　　　　　　　　　　　　(212) 661-0009
　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Defendant Thomas Hardin*